UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | |
|---|---|
| ANN MARIE LEMIRE,<br><br>Plaintiff,<br><br>v.<br><br>ARMOR CORRECTIONAL<br>HEALTH SERVICES, INC.,<br><br>Defendant. | Civil Action No.<br><br>JURY TRIAL DEMAND |

# COMPLAINT

## Parties

1. Plaintiff Ann Marie Lemire, M.D. ("Dr. Lemire") is a resident of Portland, County of Cumberland, State of Maine.

2. Defendant Armor Correctional Health Services, Inc. ("Armor") is a Florida corporation.

3. At all times relevant to this action, Armor contracted with the Cumberland County Jail ("CCJ") to provide medical services to inmates at the CCJ in Portland, County of Cumberland, State of Maine.

4. At all times relevant to this action, Armor has employed more than 500 employees in each of 20 or more calendar years.

## Jurisdiction and Administrative Proceedings

5. This Court has subject matter jurisdiction of this action pursuant to 28 U.S.C. § 1332(a)(1).

6. Dr. Lemire filed a charge of retaliation in violation of the Maine Whistleblowers' Protection Act against Armor with the Maine Human Rights Commission ("the Commission") dated December 9, 2019.

7. On January 13, 2021, the Commission issued a finding of reasonable grounds to believe that unlawful discrimination had occurred.

8. The Commission failed to enter into a conciliation agreement to which Dr. Lemire was a party within ninety (90) days of issuing said finding.

## Factual Allegations

9. Dr. Lemire is a decorated physician who has been licensed to practice in Maine since 1987. She is board-certified in internal medicine and pediatrics.

10. Dr. Lemire has devoted her life to providing badly needed healthcare to underserved and vulnerable populations, including working for the City of Portland's Public Health Division delivering medical care primarily to poor and homeless individuals from 1994 until the City of Portland's clinics closed in 2017.

11. The CCJ is operated by the Cumberland County Sheriff's Office and Cumberland County Sheriff Kevin Joyce.

12. The CCJ contracts out medical services for inmates to a third-party vendor. In 2017, the contract to operate the CCJ's Medical Unit was held by Corizon Health, Inc. ("Corizon").

13. In July 2017, Corizon hired Dr. Lemire as the Medical Director of the CCJ's Medical Unit.

14. In August 2018, the CCJ declined to renew its contract with Corizon.

15. CCJ subsequently awarded a new contract to Armor to provide all medical

services to CCJ's inmates, starting in September 2018.

16. As part of the transition of medical services between the Corizon and Armor contracts, Armor hired Dr. Lemire to continue serving as the CCJ's Medical Director.

17. Dr. Lemire's employment with Armor began on September 1, 2018.

18. From the time Armor took over the CCJ contract from Corizon, conditions in the Medical Unit began to deteriorate.

19. Among other problems, Armor failed to staff the CCJ's Medical Unit at sufficient levels, repeatedly failed to pay employees in full and on time, and demanded changes in patient care protocols without issuing guidance for the new protocols.

20. Dr. Lemire was particularly concerned about understaffing in the Medical Unit, which only grew worse as time passed. As a result of this critical staffing shortage, patients in the Medical Unit received delayed or inadequate care.

21. In Spring 2019, Dr. Lemire reported her concerns regarding the critical staffing shortage to Armor's then-Chief Medical Officer Timothy Hughes, M.D., who was a member of Armor's national management team.

22. Despite Dr. Lemire's reports, Armor did not rectify the dangerously insufficient staffing levels.

23. In July 2019, Dr. Lemire reported via email to Sheriff Joyce, who oversaw the CCJ and was ultimately responsible for inmate health and safety, that staffing in the Medical Unit was at just 54% of the necessary levels. Dr. Lemire's email to Sheriff Joyce was forwarded to Armor, yet Armor still failed to rectify the staffing shortage.

24. One stark example of the understaffing's ramifications occurred in August 2019 after a CCJ inmate suffered a psychotic episode and refused all food, water, and

medications. Without psychiatric medical staff or enough nurses to properly monitor and care for the inmate, he became dehydrated and was eventually rushed to the hospital in acute renal failure.

25. Dr. Lemire's concern over the health and safety of the Medical Unit's patients and the gravity of the staffing shortage were exacerbated as she became aware, over the course of her employment, that Armor was embroiled in numerous lawsuits in other states alleging egregious and sometimes fatal neglect of inmates under its care, including a lawsuit alleging circumstances similar to the August 2019 incident that led to an inmate's hospitalization.

26. Sheriff Joyce organized a September 17, 2019, town hall-style meeting to address numerous issues arising under Armor's poor management of the Medical Unit, including the staffing shortage.

27. Present at the meeting were members of the Medical Unit's staff, including Dr. Lemire and representatives from Armor, including Clinical Operations Specialist Mark Miller ("Mr. Miller") and Executive Vice President and Chief Nursing Officer Angela Goehring ("Ms. Goehring"). Sheriff Joyce advised Armor employees at the meeting that they should be open about any problems, as they would face no negative employment repercussions.

28. During the meeting, Dr. Lemire stated her concerns regarding understaffing in the CCJ's Medical Unit to Ms. Goehring and Mr. Miller. Specifically, Dr. Lemire reported that there was a dire staffing shortage in the Medical Unit that was endangering patient health and safety.

29. Ms. Goehring stated she understood Dr. Lemire's concerns and acknowledged that the situation in the Medical Unit was unacceptable. She assured the meeting attendees that "there would be boots on the ground" within the next week to assist the Medical Unit's staff with patient care.

30. Contrary to Ms. Goehring's assurances, Armor failed to provide the Medical Unit with additional staff the following week.

31. Accordingly, on September 24, 2019, Dr. Lemire emailed Sheriff Joyce to report that Armor had failed to provide the promised assistance and that the staffing levels remained critical.

32. Still seeing no improvement, Dr. Lemire emailed Armor's Chief Medical Officer, Dr. James Fernandez, on October 8, 2019, explaining that the staffing situation in the CCJ's Medical Unit was "CRITICAL," as the Medical Unit had only 52% of the nurses needed to run the unit. Her email went on to state: "I feel you should know this as errors are being made and more will be made before all of this is over."

33. Later that same day, Dr. Lemire received a promotional email advertising that Armor was hiring for a new Medical Director for the CCJ.

34. When Dr. Lemire contacted Dr. Fernandez to express her shock and confusion at discovering Armor was advertising for her replacement as Medical Director, she was told that the advertisement had been posted in error and would be removed.

35. Dr. Lemire was away on vacation from October 13 through October 19, 2019.

36. When Dr. Lemire returned to work on October 21, 2019, she was met at the door to the CCJ by Mr. Miller. When Dr. Lemire tried to enter the jail, Mr. Miller grabbed

her arm and forced the door closed on her foot.

37. Mr. Miller called to three nearby correctional officers, motioning for the officers to assist him in restraining Dr. Lemire. Stunned at being treated in such a manner, Dr. Lemire allowed Mr. Miller to escort her to a meeting room in the jail complex.

38. There, Dr. Lemire was met by Ms. Goehring and Dr. Fernandez, who had flown to Portland from Florida. Ms. Goehring and Dr. Fernandez informed Dr. Lemire that her employment with Armor was terminated for purported "insubordination."

39. Dr. Lemire was terminated one day before a team from the American Correctional Association ("ACA team") arrived at CCJ for a scheduled review of CCJ's accreditation with the organization.

40. Upon information and belief, renewal of Armor's contract with CCJ depended on whether the ACA team granted CCJ continued accreditation.

41. Prior to her termination, Dr. Lemire had never been subject to disciplinary action by Armor.

42. Prior to her termination, Dr. Lemire was not aware of any complaints from CCJ personnel, including Sheriff Joyce, regarding her job performance.

43. Upon information and belief, in the days immediately following Dr. Lemire's termination Dr. Fernandez told multiple Armor employees that Dr. Lemire had been terminated at the urging of Sheriff Joyce, who had complained to Armor about her conduct.

44. These statements were false and defamatory, as Sheriff Joyce never complained to Armor about Dr. Lemire nor suggested Armor terminate her employment.

45. Meanwhile, Armor told Sheriff Joyce that Dr. Lemire had been terminated

for having a bad attitude, being uncooperative with Armor, and making negative and disparaging comments to Armor.

46. These statements to Sheriff Joyce were also false and defamatory, as Armor terminated Dr. Lemire's employment because she complained to Armor of critical staffing shortages that were endangering patient health and safety in the CCJ's Medical Unit.

## COUNT I
**Violation of the Whistleblowers' Protection Act**
**26 M.R.S. § 833 et seq.**

47. Dr. Lemire repeats and realleges each of the allegations contained in paragraphs 1 through 46 above as if more fully set forth herein.

48. Acting in good faith, Dr. Lemire reported to Armor what she had reasonable cause to believe was a condition or practice that would put at risk the health or safety of other individuals.

49. These reports to Armor, as Dr. Lemire's employer, constitute protected activity under the Maine Whistleblowers' Protection Act.

50. Acting in good faith, Dr. Lemire reported to Sheriff Joyce what she had reasonable cause to believe was a condition or practice that would put at risk the health or safety of other individuals.

51. Pursuant to 26 M.R.S. § 832(4), Dr. Lemire's reports to Sheriff Joyce qualify as reports to a "public body," and therefore constitute protected activity under the Maine Whistleblowers' Protection Act.

52. Armor discriminated and retaliated against Dr. Lemire in response to her protected reporting activity by terminating her employment.

53. The false, defamatory, and inconsistent justifications Armor has since

advanced for Dr. Lemire's termination are merely pretext for its true retaliatory motive.

54. The false, defamatory, and inconsistent justifications Armor has since advanced for Dr. Lemire's termination were made with malice or with reckless indifference to the rights of Dr. Lemire protected under the Maine Whistleblowers' Protection Act.

55. By virtue of the foregoing, Armor has violated Dr. Lemire's right to be free from retaliation in response to reporting what she reasonably believed to be a condition or practice that would put at risk the health or safety of other individuals.

56. As a direct and proximate result of Armor's actions against Dr. Lemire, she has suffered and will continue to suffer damages, including, but not limited to lost wages and benefits, humiliation and embarrassment, financial distress, emotional distress, injury to reputation, injury to professional career, and other pecuniary and non-pecuniary losses.

**WHEREFORE,** Plaintiff Dr. Lemire demands judgment against Defendant Armor Correctional Health Services, Inc. in an amount of compensatory and punitive damages to be determined by the Court pursuant to 5 M.R.S. § 4613, interest, costs, reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

<u>COUNT II</u>
**Defamation**

57. Dr. Lemire repeats and realleges each of the allegations contained in paragraphs 1 through 56 above as if more fully set forth herein.

58. Armor, through its agents, made false statements concerning Dr. Lemire's professional conduct and job performance, and the cause of her termination.

59. Armor, through its agents, published its statements to third parties with knowledge of the falsity of the statements or in reckless disregard of the falsity of such statements.

60. The statements were defamatory and were intended to harm Dr. Lemire's professional standing and her standing in the community.

61. The unprivileged communications had the tendency to injure and have in fact injured Dr. Lemire in her occupation and profession.

62. As a direct and proximate result of Armor's false statements, Dr. Lemire has been injured in her occupation and profession, and has incurred mental suffering, humiliation, embarrassment and damage to her reputation and professional standing.

63. Armor's conduct, as described above, was motivated by malice or ill will toward Dr. Lemire, or Armor's deliberate conduct was so outrageous that malice toward Dr. Lemire can be implied.

**WHEREFORE,** Plaintiff Dr. Lemire demands judgment against Defendant Armor Correctional Health Services, Inc. in an amount of compensatory damages that is reasonable under the circumstances, punitive damages in an amount appropriate under the circumstances, interest, costs, reasonable attorneys' fees and such other and further relief as this Court deems just and proper.

### DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all issues deemed to be triable by a jury.

Dated: July 6, 2021

Respectfully submitted,

/s/Emily P. Crowley
David P. Silk
Emily P. Crowley
CURTIS THAXTER LLC
One Canal Plaza, Suite 1000/P.O. Box 7320
Portland, ME 04112-7320
Telephone: (207) 774-9000
dsilk@curtisthaxter.com
ecrowley@curtisthaxter.com

Dated:  July 6, 2021            /s/Paul M. Boots
                                Paul M. Boots
                                Law Offices of Paul M. Boots
                                120 Exchange Street, Suite 400/P.O. Box 7469
                                Portland, ME 04112
                                Telephone: (207) 773-0410
                                paul@bootslaw.com

                                *Counsel for Plaintiff*
                                *Ann Marie Lemire*